IN THE DISTRICT COURT OF THE UNITED STATES
IN THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

UNITED STATES OF AMERICA     )     CRIMINAL NO. 8:18-cr-389-HMH
                             )
                             )
            vs.              )
                             )
                             )
WESLEY DALLAS AYERS          )

**GOVERNMENT'S RESPONSE TO MOTION TO SUPRESS**

The government hereby responds to the defendant's motion to suppress.  (See ECF No. 71.)   The defendant seeks suppression of evidence seized by law enforcement during the search of his residence, 909 Travis Road, Anderson, South Carolina, on March 3, 2018.   Among other bases, the defendant argues that the confidential source statements included in the application for the search warrant were not credible such that probable cause for the search did not exist.

Suppression is not justified.

**PROCEDURAL HISTORY**

On April 11, 2018, a Grand Jury sitting in the District of South Carolina returned a twelve-count Indictment charging the defendant with violations of Title 18, United States Code, Section 844(d); Title 18, United States Code, Section 844(h); Title 18, United States Code, Section 924(c); and Title 26, United States Code, Section 5861(d).   (ECF No. 23.)   On May 15, 2018, the defendant was arraigned in federal court.   (ECF No. 49.)   At that time, the defendant was ordered for a psychiatric examination.   (ECF No. 46.)   The defendant did not appear again in

1

federal court until September 25, 2018, for his competency hearing.   (ECF. No. 62.)   The Court

granted a continuance at an October 9, 2018, pretrial conference.   (ECF No. 69.)   The next

pretrial conference is now scheduled for November 6, 2018.   (ECF. 70.)

The defendant filed the instant Motion to Suppress, on October 16, 2018.   (ECF No. 71.)

### FACTS

The defendant is accused of placing six devices, three with live explosives and three with

hoax or non-live explosives, in Anderson County, South Carolina, between January 24, 2018 and

February 24, 2018.

On January 30, 2018, (hereinafter Incident No. 2)[1]  at approximately 9:00 p.m., a Kenneth

Bearden and his fourteen year-old daughter were driving east on Travis Road in Anderson County,

South Carolina.   (Govt. Ex. A, Affidavit in Support of Search Warrant, ¶ 8.)   As their vehicle

approached the stop sign at the intersection of Travis Road and Martin Road, they observed an

apparent box resting in the middle of the roadway on the stop line at the intersection.   *Id*.   The

box was constructed of a wicker-type material and had a green light emanating from inside the

box.   *Id*.   Mr. Bearden initially stopped his Chevrolet Tahoe just past the box and then backed

the vehicle up so the box was adjacent to the driver's door.   Mr. Bearden stepped out of the

vehicle to more closely observe the green light and metal objects inside the box.   *Id*.   When Mr.

Bearden opened the lid, he heard clicking noises and then an explosion occurred.   *Id*.   Mr.

Bearden received burns and small lacerations to his legs but was not seriously injured.   *Id*.   After

the incident was reported to 911, deputies from the Anderson County Sheriff's Office (ACSO),

including the ACSO bomb squad, quickly responded to the scene.   Special Agents from the

---

[1] Although the first device discovered by law enforcement, as will be explained, the January 30 device was actually the second one placed by the defendant.

2

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) were contacted and arrived at the scene a short time later.   Based on the review of surveillance camera footage from a nearby residence, witness interviews and preliminary examination of the evidence, it is believed that the device functioned when Mr. Bearden lifted the lid of the wicker box causing injuries to himself and damage to the automobile and roadway.   *Id*. ¶ 11.

Between January 30 and 31, 2018, investigators processed the scene, to include taking photographs and collecting evidence.   *Id*. ¶ 9.   The intersection at Travis Road and Martin Road was closed to traffic in all directions for approximately five hours.   *Id*.   The seat of the blast was located on Travis Road just next to the stop line, consistent with Mr. Bearden's statement, and caused damage to the asphalt.   *Id*.   A preliminary examination of the evidence revealed that the wicker box contained a suspected destructive device.   *Id*.   The blast-damaged components of the device consisted of an apparent metal automotive oil filter, AA batteries, wires, an improvised clothes pin switch, monofilament fishing line, a folded piece of paper attached to the fishing line, a possible electronic slide switch, suspected explosives powder and a green cyalume (glow) bracelet/stick.   *Id*.

Also included among the post blast debris were fragments of paper that appeared to depict a picture of the White House with a black flag flying from the roof; Arabic writing was visible in portions of the photograph.   *Id*. ¶ 10.   The picture and writing appeared to be a printed or photocopied document.   *Id*.   Initial analysis of the fragments by the Federal Bureau of Investigation (FBI) determined that the flag in the photo was known to be representative of the "Black Banner of Jihad" which is utilized by the Al Qaeda and the Islamic State of Iraq and Syria or "ISIS."   *Id*.   The Arabic writing translated into "Allah is Greatest" and "Mother of the

3

Mujahideen." *Id*.

On January 31, 2018, investigators received information that an area resident had posted a photograph and accompanying narrative on Facebook relating to a box containing a "pipe bomb" that he had found along a roadway, on January 24, 2018, (hereinafter Incident No. 1), prior to the January 30 explosion. *Id*. ¶ 12. ACSO, ATF and FBI investigators subsequently interviewed the resident who advised that, on January 24, 2018, at approximately 6:30 a.m., he was driving on Martin Road when he observed a small box next to the guardrail on a bridge over a creek. Id. The resident stated that the box looked like a jewelry box or treasure chest made of wood with brass or gold bands on the outside. *Id*. ¶ 9. The resident had stopped his vehicle, picked up the box, and shook it slightly to determine if it contained anything. *Id*. He indicated that the box was moderately heavy and seemed to have something inside. *Id*. The resident had opened the lid and observed what he believed to be a possible "pipe bomb" with wires coming from it and going to the lid. *Id*. The resident stated that the device was shiny or galvanized metal, approximately 5-6" in length, 2-2.5" in diameter and wrapped with black, electrical tape. *Id*. The resident indicated that he then set the box back down and departed the area before returning with a co-worker, at approximately 6:50 a.m., who also examined the box. *Id*.

Investigators also interviewed the co-worker. *Id*. ¶ 13. The co-worker similarly described the box.

Subsequent to the January 30 explosion, on February 4, 2018, (hereinafter Incident No. 3) at approximately 2:50 p.m., a small box, this time black in color, along Highway 29 in Anderson County was again discovered. *Id*. ¶ 14. ACSO, ATF and FBI investigators responded to the scene where bomb technicians x-rayed and examined the box. *Id*. The box was hard, black

4

plastic with what was later determined to be an electronic window alarm and a small, plastic illuminating ball taped to the outside of the box with black electrical tape, red wires protruding from inside the box and a small piece of clear tape. *Id.* Inside the box, investigators found a three-page, typed letter that included statements referring to the "Islamic state and flag," "jihad," "the ignorance of the United States," the "package" and that "Tuesday was just a practice run." The letter essentially claimed responsibility for the incidents and made threats to use "more powerful tools" in the future. *Id.*

On February 15, 2018, (Incident No. 4), at approximately 10:18 p.m., the ACSO received a call from a complainant who said she was driving along Little Mountain Road in Anderson, South Carolina and observed a suspicious package sitting on the double yellow lines in the middle of the two-lane road. *Id.* ¶ 15. The ACSO, South Carolina Law Enforcement Division (SLED), including a SLED bomb technician, the ATF, the United States Secret Service (USSS), and the FBI, including an FBI bomb technician, reported to the scene where bomb technicians x-rayed and examined the package. *Id.* The x-ray and examination revealed that the package was a basket and inside the basket was a child's toy teddy bear stuffed animal. *Id.* The x-ray revealed that the teddy bear contained what appeared to be a sealed pipe with fragmentation on the inside, possibly nails. *Id.* There were also batteries and wires present, appearing to be attached to the pipe. Bomb technicians conducted a "render safe" disruption of the possible ignition system by using a precision grid shot on the batteries/possible ignition system. *Id.* After the render safe disruption, bomb technicians utilized special equipment to remove the pipe and wires. Id. Upon examination, the pipe appeared to be copper. *Id.* Further render safe operations were conducted, and the pipe was transported via secure containment vessel to a safe location where

final render safe operations were conducted.    *Id*.

On February 18, 2018, (hereinafter Incident No. 5), at approximately 7:16 a.m., the ACSO received a call from another County resident who said he was driving along Highway 29 South in Anderson, South Carolina and observed a suspicious package sitting on the double yellow lines in the middle of the road.    *Id*. ¶ 16.    The ASCO, the USSS, Greenville County Sheriff's Office (GCSO), and the FBI responded to the scene where bomb technicians x-rayed and examined the package.    *Id*.    The x-ray and examination revealed that the package was a black wooden box wrapped in black electrical tape with white and grey wires protruding out from the top of the box. *Id*.    The x-ray and examination of the box also revealed that the box did not contain any explosive material and was determined to be safe to handle.    *Id*.    Inside the box, investigators found two separate hand-written messages.    The first message stated:    "We The 19 Lions of ummah Pledge our allegiance To the Islamic State! Insha ALLAH Your county will soon understand That you are No Longer Safe! These littel Boxes WERE ONLY PRACTICE RUNS!! THE TIME IS ALMOST UPON YOU!!!"    *Id*.    The second message stated:    "Were 30 MILeS AWAY BUT NOT Telling You The DIRECTION".    *Id*.

Finally, on February 24, 2018 (hereinafter Incident No. 6) at approximately 1:51 a.m., the ASCO received a call reporting a suspicious package in the road at the intersection of Travis Road and Little Mountain Road in Anderson, South Carolina.    *Id*. ¶ 17.    Bomb technicians from the FBI and ACSO again x-rayed and examined the suspicious package.    *Id*.    The x-ray and examination revealed that the suspicious package was a likely victim operated improvised explosive device with an ignition switch powered by a battery.    *Id*.    It further revealed the suspicious package was a wooden box with dark writing on the outside of the box that appeared to

be in Arabic and Farsi. *Id*. There were also pipes inside the box. *Id*. Bomb technicians conducted a rendered safe disruption of the possible ignition system by using a precision grid shot on the batteries/possible ignition system, which made the device inoperable. *Id*.

Based on the foregoing and other information, which will be discussed *infra*, the government submitted to the Honorable Kevin F. McDonald, on March 2, 2018, an affidavit in support, application, and search warrant for a search of the defendant's residence at 909 Travis Road, Anderson County, South Carolina, which he signed. (Govt. Ex. A; Govt. Ex. B, Application and Search Warrant.) FBI executed that search warrant the following day, Saturday, March 3, 2018.

## DISCUSSION

The investigation of these six Incidents involved an around-the-clock manhunt that preoccupied hundreds of law enforcement officers from numerous state and federal agencies and paralyzed an entire community for more than a month's time. Seven days a week, law enforcement canvassed the whole of Anderson County conducting door-to-door and business-to-business interviews for any possible lead. No technical, digital, or tactical resource was spared. The danger, frequency, and written threats included with the devices, made every second exigent. A search warrant for the defendant's residence was sought only after the most thorough examination of all the available evidence; based on an exhaustively detailed affidavit; and in light of the predictable truth that another device was shortly forthcoming.

Even still, the defendant contests, as is his right, the legal propriety of the search of his residence at 909 Travis Road on March 4, 2018.

As an initial matter, the defendant's motion attempts to isolate certain pieces of evidence,

but certainly not all, as insufficiently credible on their own, to establish cause to search the defendant's property. Of course, the search warrant was not issued on the strength of any one evidentiary detail but rather on a multitude, which taken together, established an avalanche of cause for the search. The defendant's piecemeal objections are not only inaccurate as to the evidence they accuse, but are ultimately impotent to undermine the entirety of the force presented in the affidavit because they literally do not meet it in on the totality of its own terms. Indeed, most of the defendant's arguments could essentially be conceded by the government and they would still not justify suppression of the evidence.

I.     **The Magistrate Judge was Presented with Probable Cause to Justify a Search Warrant for the Subject Property.**

A search warrant is constitutionally sound when issued by a neutral magistrate and supported by probable cause. *See* U.S. Const. amend. IV; *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). The magistrate judge's probable cause determination is a "practical, common-sense decision whether, given all the circumstances set probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Blauvelt*, 638 F.3d 281, 288 (4th Cir. 2011) (finding ample evidence in the supporting affidavit "afford[ing] the magistrate a substantial basis upon which to conclude that probable cause existed"). Probable cause is evaluated through a "totality-of-the-circumstances" analysis rooted in common sense. *Gates*, 462 U.S. at 230.

Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Probable cause exists where "the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that

8

an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313 (1959).

When reviewing a determination of probable cause, the court "must accord 'great deference' to the magistrate's assessment of the facts presented to him." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir.2011) (quoting *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir.1990)). "[P]robable cause involves probabilities-judgment calls that are tethered to context and rooted in common sense." *United States v. White*, 549 F.3d 946, 947 (4th Cir. 2008). Thus, the inquiry is whether there was a "substantial basis for determining the existence of probable cause." *Gates*, 462 U.S. at 239, 103 S.Ct. 2317.

The following evidence, taken together, established cause for the search of the subject property:

1. The personal observation by two confidential informants, with access to the subject property and the defendant (Govt. Ex. A ¶¶ 18, 25), that the defendant:

   a. Makes blasting agents (gunpowder) and explosive devices on the subject property, *id*. ¶¶ 20-22, 26;

   b. Made such explosive devices with distinctive Heating, Venting, and Air Conditioning (HVAC) components and in a distinctive fashion on the subject property (the crimping of pipes to fill with gunpowder), similar to devices found at Incident Nos. 4 and 6, *id*. ¶¶ 22-24;

   c. Makes waterworks or overpressure bottle bombs on the subject property, similar to a device found at Incident No. 6, on February 24, 2018, *id*. ¶¶26;

   d. Made a statement at the end of February 2018, just prior to the application for the warrant, that he had "put something out and it got picked up" and now the "Feds"

are in town, *id*. ¶ 27;

    e.  On the subject property, practiced a Muslim faith and wore traditional clothing associated with the practice of Islam, *id*. ¶ 28;

    f.  On the subject property, brutalized animals with a barbed wire-wrapped baseball bat, *id*. ¶ 25.

2.  The proximity of the subject property to all six incidents, including Incident No. 6, which was less than 100 yards from the subject property, *id*. ¶¶ 19;

3.  Cellular telephone data from the defendant's telephone that identified it as being positioned proximate to the location of Incident No. 4 and utilizing a cellular Tower and Sector that his telephone did not frequently use, *id*. ¶¶ 35;

4.  The defendant's presence at the post-blast scene of Incident No. 2, *id*. ¶¶ 33-34;

5.  Aerial surveillance of the subject property that revealed:

    a.  HVAC materials and units, which are not perishable, littered throughout the property, *id*. ¶ 39; and

    b.  During and after an interview of the defendant at the subject property, individuals moving into and out of multiple structures on the property, *id*. ¶ 32;

6.  Information that the defendant works for his father's HVAC company, which operates out of the subject property, *id*. ¶ 38;

7.  Tattoos on the defendant, as observed by law enforcement, to include a teddy bear similar to the one utilized at Incident No. 4 and the depiction of a "ball and fuse" bomb, *id*. ¶ 29; and

8.  The training and experience of the affiant, which informed him that persons who possess

or manufacture destructive devices do so at their homes or residences, *id*. ¶ 5.

The sum effect of all such evidence was that there was cause to believe that the defendant (1) engaged in a particular and unique type of bomb-making, consistent with devices found at the various Incidents, very near to the subject property; and (2) which were comprised of the kinds of components known by law enforcement to be recently located on the subject property.

The defendant has not even attempted to challenge the proximity, cellular-device, aeriel-surveillance, body art, HVAC-business, or law-enforcement-expertise evidence included in the affidavit.    In other words, the defendant's motion does not take seriously the totality of circumstances actually before the magistrate judge and which would necessarily need to be refuted before any evidence could possibly be suppressed.    Such is the law; probable cause is a "totality-of-the-circumstances" analysis. *Gates*, 462 U.S. at 230.

## II.    Evidence Existed for the Magistrate Judge to Find the Confidential Sources Credible.

Instead, the defendant has focused almost exclusively on the credibility of the confidential sources to undermine the propriety of the warrant.    The government will address each objection in turn.

### A.  *Confidential Source No. 1*

The defendant emphasizes the source's drug usage and prior felony convictions.    Of course, the defendant is aware of such details precisely and only because they were included in the affidavit considered by the magistrate judge.   (Govt. Ex. A nn. 1, 2.)   It is to the credit of the affidavit and the concomitant search warrant that the magistrate judge was apprised of all known issues in veracity and bias.    Even still, he issued the warrant and that decision should be given great deference.    *See Montieth*, 662 F.3d at 664.

11

Generally, when an effort is made to establish probable cause for the issuance of a search warrant based on hearsay from an informant, "it is necessary to consider all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information.   The degree to which an informant's story is corroborated may also be an important factor." *United States v. DeQuasie*, 373 F.3d 509, 518–19 (4th Cir. 2004); *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir.2004).   However, "[t]here is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible.   Whether subsequent corroboration is necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts."   *DeQuasie*, 373 F.3d at 519 (citing *United States v. Blount*, 123 F.3d 831, 836 (5th Cir.1997) (en banc)).   And, so the knowledge and inclusion of the source's drug usage and convictions, in this case, are literally to the strength of the warrant secured and not its detriment; the magistrate judge plainly considered their effect, if any at all, in his determination that probable cause existed.

Moreover, drug usage is not a matter of *general* credibility. *See Jarrett v. United States*, 822 F.2d 1438, 1446 (7th Cir.1987) ("A witness's use of drugs may not be used to attack his or her general credibility, but only his or her ability to perceive the underlying events and testify lucidly at the trial."); *United States v. Apperson*, 441 F.3d 1162, 1195–96 (10th Cir. 2006).   And, the inclusion of the defendant's prior convictions was not even necessary where there otherwise existed corroboration of his statements, and yet the magistrate judge was, in fact, made aware of the same.   "When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir.2000); *see United States v. Daniels*, 323 Fed. App'x 201, 209–10 (4th

Cir.2009) (finding that the affidavit's failure to mention that the confidential informant had been found engaging in drug trafficking activity on three occasions in the days prior to, and including, the day the search was sought, and that he attempted to flee from law enforcement during a prior arrest, was not "material in the Franks context"); *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.1993) ("[a]n important factor in determining whether an informant's report establishes probable cause is the degree to which it is corroborated.").

To this end, the defendant's overarching accusation that there is "no evidence" that the source's "statements are reliable or credible" (ECF No. 71-1 at 2) is simply false.    The affidavit specifically demonstrates the following evidentiary corroboration of various statements of Confidential Source No. 1:

1.  The source's statements were the product of his own direct personal knowledge of the defendant and the defendant's activities on the subject property from January 2017 through March 2017, as a resident of the subject property. (Govt. Ex. A ¶ 18)

2.  The source stated that the defendant manufactured his own blasting agent (gun powder), (Govt. Ex. A ¶ 20); in corroboration, lab analysis of the powder at Incidents Nos. 4 and 6 confirmed that the explosive powder in those devices had been homemade and were not attributable to any commercial manufacturing, *id*. ¶ 24.

3.  The source stated that he observed the defendant "crimp[ing]" the end of a pipe and pouring explosive powder in the other "open" end before capping it or crimping it or in some other fashion sealing the "loading" end of the pipe, *id*. ¶ 22; in corroboration, two of the six devices (Incident Nos. 4 and #6) contained crimped piping consistent with the methodology described, *id*. ¶ 24.    In further corroboration, law enforcement

13

identified this methodology as unique. *Id*. ¶ 23

4. The source stated that the defendant also used HVAC components, pipes, and other cylindrical items to fabricate vessels for explosive device creating what is commonly known as an "Improvised Explosive Device", *id*. ¶ 22; in corroboration, the device at Incident No. 6 utilized a very specific HVAC component in its mechanism, id. ¶ 39. In further corroboration, aerial surveillance established the then-existing presence of numerous HVAC units and components on the subject property and the defendant's father operated an HVAC business from the same.     *Id*. ¶¶ 38, 39.

The source's statements about the defendant's activity, therefore, were highly consistent with especially particularized attributes of the crimes under investigation.     Those details unique to the devices at issue, and consistent with the source's statements, were not otherwise publically known or published at that time.     Such unlikely consistency, therefore, was reasonable evidence of the source's credibility in the magistrate judge's probable cause determination.

In the alternative, the defendant complains that Confidential Source No. 1's information is essentially stale because he had last lived on the subject property in March 2017.     (Govt. Ex. A 18.)     The government concedes that the affidavit must include probable cause to believe that evidence of a crime was *then* existing, at the time of application in the place to be searched. "[T]ime is a crucial element of probable cause.     A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. *United States v. McCall*, 740 F.2d 1331, 1335–36 (4th Cir. 1984) (quotations omitted).     But, such fact – timeliness – need not be established exclusively through this particular confidential source.     Indeed, the main purpose of Confidential Source No. 1 was

14

simply to establish that the defendant had the capacity and the knowledge, not only to build explosive devices, but also to build the precise type of explosive devices at issue in this investigation – constructed of homemade powder, crimped pipes, and HVAC components. As detailed above, his corroborated statements accomplished this purpose impressively.

Rather, in this case, the likelihood that evidence of the alleged crimes were actually still present at the residence at the time of the application for the warrant included, in addition to evidence of the defendant's bomb-making expertise:

1. The recent placement of improvised devices of the kind described by the source;

2. The recent statement of the defendant, at the end of February 2018, just prior to the application for the warrant, that he had "put something out and it got picked up" and now the "Feds" are in town, (Govt. Ex. A. 27);

3. The ongoing HVAC business operation of his father on the subject property, *id*. ¶ 38; and

4. The immediately corroborating aerial surveillance that HVAC units and components were still present throughout the subject property as of the time of the warrant application, id. 39.

Evidence of the defendant's bomb-making history, especially in light of the particular kind of explosives at issue in this case, made these very time-related and property-specific details about what kind of evidence was likely present on the property at the beginning of March 2018, highly relevant. The affidavit further emphasized the knowledge of the affiant, based in experience and training, that people who possess and manufacture destructive devices do so at their homes. *Id*. ¶ 5(a). The Fourth Circuit has repeatedly indicated that it is reasonable to suspect that criminals

15

store evidence of their criminal activity where they reside. *See United States v. Grossman,* 400 F.3d 212, 217 (4th Cir. 2005). "[A] sufficient nexus can exist between a defendant's criminal conduct and his residence *even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence. Id.* (emphasis added and quotations omitted). Accordingly, the corroborated statements of the confidential source about the defendant's known bomb-making activity only compounded the otherwise sufficient statement of timely cause in the affidavit.

### B. *Confidential Source No. 2*

The defendant raises essentially the same objections concerning the reliability of Confidential Source No. 2's statements. The government would simply incorporate, again, its response concerning drug use and any prior convictions, all of which were disclosed to the magistrate judge with respect to Confidential Source No. 2. (Govt. Ex. n. 2.) The defendant argues, baldly, however, "The fact that Confidential Informant #2 stated that Mr. Ayers was a Muslim, drove a black car with red paint and owned a bat with barbed wire does not establish the reliability or credibility of the informant." (ECF No. 71-1 at 4.)

But, it does.

The government would repeat the same exercise as above. The affidavit specifically demonstrates the following evidentiary corroboration of various statements of Confidential Source No. 2 that proves his reliability, generally:

1. The source's statements were the product of his own direct personal knowledge of the defendant and the defendant's activities on the subject property, but from a much more recent and relevant timeframe, July 2017

16

through December 2, 2017, also as a resident of the subject property (Govt. Ex. A ¶ 25);

2. The source stated that he had witnessed the defendant fabricate multiple "waterworks" bombs, also known as overpressure bottle bombs, and large and small "sparkler" bombs and described the manufacture of each type, *id*. ¶ 26); in corroboration, at Incident No. 6, an overpressure bottle bomb was found in addition to the improvised explosive device already described;

3. The source stated that, on at least three occasions, he observed the defendant wearing "Arabic drapes" (Thobe) and a headdress typically worn by devout male followers of the religion of Islam and praying, *id*. ¶ 28; the devices at Incident Nos. 2, 3, and 5 included Islamic themed ideological statements and law enforcement observed the defendant also wearing what appeared to be Arabic jewelry during his interview, *id*. ¶¶ 10, 14, 16, 30.[2]

4. The source stated that the defendant had a baseball bat wrapped in barbed wire and drove a black car decorated with red hand prints and red paint splatter on its surface, *id*. ¶¶ 25, 27; in corroboration, law enforcement observed both the

---

[2] The government is not correlating the practice of Islam with radical terrorist groups or the terroristic rhetoric included with certain explosive devices in this case. But, based on the demographic of the defendant and Anderson County, South Carolina, it is probative, in light of all the other details of this case, that Islamic rhetoric was employed with the bombs and the defendant, and then target, just happened to have experience with that faith practice in a part of the country where his experience was probabilistically unlikely. http://www.city-data.com/county/religion/Anderson-County-SC.html (indicating Muslims were less than 1% of population in 2010; 609 adherents total in 2000); http://www.thearda.com/ql2010/QL_C_2010_1_28c.asp. Again, it is not a conflation of the two – religion and terrorism. And, the defendant's experience with Islam would have never appropriately make him a target. But, the Confidential Source's observation of these details about the defendant were credible precisely because they were unlikely, especially in light of the unique attributes of certain of the devices and all the evidence before the magistrate judge concerning the defendant and the subject property. "[P]robable cause involves probabilities-judgment calls that are tethered to context and rooted in common sense." *White*, 549 F.3d at 947.

bat at the defendant's residence and an individual resembling the defendant driving the black car at Incident No. 2, *id*. *¶¶* 31, 33;

To be clear, the question is not whether these pieces of evidence indicate that the defendant committed the crimes, although some are indeed probative in that sense. Rather, they are details, which would have likely been unknown to the confidential source but for the fact that they are actually true. In other words, these details corroborate the source's account and credibility generally, to whatever end. Because there is objective affirmation of the source's statements the source was reasonably considered reliable, in spite of the defendant's now rote objection that he was simply incredible. For instance, his accuracy or rather apparent consistency about certain probative details concerning the defendant establishes some evidence of credibility such that the magistrate judge may credit, as also reliable, the confidential source's highly probative statement that he had actually heard the defendant say, recently, that he had "put something out and it got picked up" and now the "Feds" are in town, (Govt. Ex. A. 27).

As the defendant complains, Confidential Source No. 2 certainly had a bias. But, that bias, just like his substance abuse and criminal history, was expressly indicated and described in the affidavit itself. *Id*. n.2. So, whatever discounted effect one might conceivably desire to give that fact is literally overwhelmed in the wash of reliable evidentiary cause existing otherwise in the affidavit. Motive is "not necessarily essential to the probable cause determination . . . in the context of a detailed affidavit that had been extensively corroborated," as was before the magistrate judge here. *United States v. Glover*, 755 F.3d 811, 817-18 (7th Cir. 2014).

Finally, the defendant argues that the defendant's Arabic necklace, social media activity, baseball bat, and car are not probative of criminal activity. The government agrees. Rather, all

18

such details were relevant to the credibility of source information as described and were included in the affidavit for those reasons.

And, while his presence at Incident No. 2 would be insufficient on its own to justify the warrant, certainly it is not an irrelevant detail, as the defendant complains,in light of all the evidence in this case. "While mere presence at the scene of a crime, or in the company of a person engaging in criminal activity is not, by itself, sufficient to establish probable cause, seemingly innocent activity . . . may provide the basis for a showing of probable cause when considered in the context of all the surrounding circumstances." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir.1996) (quotations omitted). And, respectfully, it had tremendous context:

1. The defendant's specific expertise in building the precise types of devices found at the Incidents in this case;

2. The defendant's access to particularized components used in such devices, located on the subject property;

3. The ongoing and recent presence of such parts on the subject property;

4. The proximity of both the defendant and the subject property to the Incidents;

5. The defendant having recently admitted that he had "put something out," sufficiently dangerous to attract the attention of federal law enforcement; and

6. Evidence and jurisprudence indicating that the individual responsible for such devices likely kept evidence of the crime on his property.

In the affirmative, there was substantial cause for the magistrate judge to believe that evidence of a crime was present at 909 Travis Road. And, the defendant's specific objections about the credibility of the confidential sources or the government's inclusion

19

of certain factual details are legally ineffective to undermine it.

### III.     Even if There is Insufficient Cause, the Good-Faith Exception Justifies Law Enforcement's reliance on the Warrant.

Even if the Court somehow finds the search warrant invalid for a lack of probable cause, all evidence from the search is admissible under the "good faith" exception to the exclusionary rule carved out in *United States v. Leon*, 468 U.S. 897 (1984).   "*Leon* teaches that a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir.2002) (citations omitted).   Usually, searches conducted "pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (internal quotations and citations omitted); *see also United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004).   The officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must simply be objectively reasonable.   *See Leon*, 468 U.S. at 923.   *Leon*, however, identifies four circumstances in which an officer's reliance on a warrant would not qualify as "objectively reasonable": (1) when the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when an affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that

20

the executing officers cannot reasonably presume it to be valid. *Perez*, 393 F.3d at 461.

The defendant makes no argument at all in this regard. There is no evidence that the magistrate was misled or that he abandoned his judicial role. And, as discussed, the affidavit is unquestionably thorough and sufficient in its probable cause description. (See Govt. Ex. A.) Accordingly, the officers, in executing the warrant at 909 Travis Road, were objectively reasonable in relying on its validity as determined by the magistrate judge. There is nothing about the warrant or affidavit that would have appeared facially deficient to a reasonable officer under the circumstances.

## CONCLUSION

No evidence in this case should be suppressed. The search warrant secured on March 2, 2018, was supported by a detailed recitation of probable cause based on the above-detailed evidence. Respectfully, the defendant's motion should be denied.

Respectfully submitted,

SHERRI A. LYDON
UNITED STATES ATTORNEY

D. Josev Brewer
Assistant United States Attorney
D.C. Bar No. 9188
55 Beattie Place, Ste 700
Greenville, SC 29601
864-282-2100

October 25, 2018

21