**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

IN THE MATTER OF THE APPLICATION OF THE    )
UNITED STATES OF AMERICA FOR AN ORDER    )
AUTHORIZING THE SEARCH OF THE PROPERTY    )
AT 913 TRAVIS ROAD ANDERSON SOUTH    )
CAROLINA 29626 MORE FULLY DESCRIBED    )
BELOW    )

                **Misc. No.**

                **(UNDER SEAL)**

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Special Agent Robert Tartaglia, Federal Bureau Investigation (FBI), being duly sworn, depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have served in that capacity since May 2016. Prior to that, I served as a Staff Operations Specialist ("SOS") for the FBI from August 2010 until May 2016. As a SOS, I provided tactical analytical support to the FBI's Counterterrorism Division in Washington, D.C., the FBI Columbia Field Office Joint Terrorism Task Force ("JTTF"), and the Columbia Violent Gang Task Force. I am currently assigned to the Columbia Field Office, where I am a member of the JTTF. My duties at the JTTF include investigating criminal violations of the federal laws of the United States. During my time as an FBI Special Agent, I have participated in investigations of individuals who are motived by extremist ideology and groups who commit or conspire to commit criminal acts, including acts of terrorism. I have conducted and participated in physical and electronic surveillance, executed search warrants, debriefed informants and cooperating witnesses, and reviewed recorded conversations. Additionally, I have received training, both formal and informal in counterterrorism cases through the FBI's training academy in Quantico, Virginia.

1

AYERS007901

2. I know that a destructive device, or Improvised Explosive Device, hereinafter IED, is defined as a "firearm" under Title 26, United States Code, Section 5845(a)(8) and that such a firearm is required to be registered with the National Firearms Registration and Transfer Record. I also know that a person who possesses a firearm which is not registered to him in the National Firearms Registration and Transfer Record is in violation of Title 26, United States Code, Section 5861(d).

3. This Affidavit is submitted in support of an application to search the property located at 913 Travis Road, Anderson, South Carolina 29626, all outbuildings located on such property (more fully described in Attachment A which is attached hereto and made a part hereof and any and all vehicles located on the property. The location is known by your affiant to be immediately adjacent, and contiguous with the rear property line, of the residence of Wesley Dallas AYERS at 909 Travis Road, who is suspected to have been in possession of unregistered destructive devices. The 909 and 913 Travis Road properties are both in the name of an Amy Ayers, who Wesley Dallas Ayers has indicated is his half-brother's wife. The information contained in this Affidavit is based upon the affiant's personal knowledge and observations, interviews with persons, review of both government and business records, and of records, reports and information received from other law enforcement sources. This Affidavit is not intended to convey all the facts of the entire investigation, but rather to establish cause to support the request for Federal search authorization.

## Applicable Statute(s)

4. Title 26, United States Code, Section 5861(d):
It shall be unlawful for any person to possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record.

2

AYERS007902

## Affiant's Personal Knowledge and Experience

5. Based on his training and experience, your affiant knows the following:

   (a) that most people who possess or manufacture destructive devices do so in their homes, vehicles and outbuildings;

   (b) that persons who possess and manufacture destructive devices usually possess other items related their manufacture, such as the components and tools used to manufacture such devices, photographs of firearms and receipts for the purchase of these items;

   (c) that persons possess in their residence, vehicles or outbuildings over which they have dominion and control, documents and photographs which indicate their occupancy and/or ownership of such residences, personal property located thereon, such as personal mail, checkbooks, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, receipts for vehicle parts and repairs, telephone answering machine introductions and photographs of themselves occupying their residence and/or vehicle(s) and other tangible evidence of their ownership and possession of such property;

   (d) that persons who possess and manufacture destructive devices often conduct research and store communications, receipts, documents and photographs on digital devices. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such

3

AYERS007903

as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6. The sources of my information and the grounds for my assertions are as follows:

7. The United States is conducting an ongoing investigation into a bombing that occurred on January 30, 2018, and subsequent IEDs, in Anderson County, South Carolina. The bombing, which occurred at a roadway intersection as described below, resulted in damage to the roadway and an automobile in transit and caused the involved roadways to be temporarily closed, thereby affecting interstate commerce.

8. On January 30, 2018, (hereinafter Incident #2) at approximately 9:00 p.m., ████████████████████████████████ were driving east on Travis Road in Anderson County, South Carolina. As their vehicle approached the stop sign at the intersection of Travis Road and Martin Road, they observed an apparent box resting in the middle of the roadway on the stop line at the intersection. The box was constructed of a wicker-type material and had a green light emanating from inside the box. ██████████ initially stopped his Chevrolet Tahoe just past the box and then backed the vehicle up so the box was adjacent to the driver's door. ████████ stepped out of the vehicle to more closely observe the green light and metal objects inside the box. When ████████ opened the lid, he heard clicking noises and then an explosion occurred. ████████ received burns and small lacerations to his legs but was not seriously injured. After the incident was reported to 911, deputies from the Anderson County Sheriff's Office (ACSO), including the ACSO bomb squad, quickly responded to

4

AYERS007904

the scene. Special Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) were contacted and arrived at the scene a short time later. After securing the scene, law enforcement performed victim and witness interviews and conducted a post blast scene investigation.

9. Between January 30 and 31, 2018, investigators processed the scene, to include taking photographs and collecting evidence. The intersection at Travis Road and Martin Road was closed to traffic in all directions for approximately five hours. The seat of the blast was located on Travis Road just next to the stop line, consistent with Mr. Bearden's statement, and caused damage to the asphalt. A preliminary examination of the evidence revealed that the wicker box contained a suspected destructive device. The blast-damaged components of the device consisted of an apparent metal automotive oil filter, AA batteries, wires, an improvised clothes pin switch, monofilament fishing line, a folded piece of paper attached to the fishing line, a possible electronic slide switch, suspected explosives powder and a green cyalume (glow) bracelet/stick.

10. Also included among the post blast debris were fragments of paper that appeared to depict a picture of the White House with a black flag flying from the roof; Arabic writing was visible in portions of the photograph. The picture and writing appeared to be a printed or photocopied document. Initial analysis of the fragments by the Federal Bureau of Investigation (FBI) determined that the flag in the photo was known to be representative of the "Black Banner of Jihad" which is utilized by the Al Qaeda and the Islamic State of Iraq and Syria or "ISIS." The Arabic writing translated into "Allah is Greatest" and "Mother of the Mujahideen." Both Al Qaeda and ISIS are designated as Foreign Terrorist Groups by the United States Department of State.

11. Based on the review of surveillance camera footage from a nearby residence, witness interviews and preliminary examination of the evidence, it is believed that the device functioned when ███████████ lifted the lid of the wicker box causing injuries to himself and damage to the automobile and roadway.

5

12. On January 31, 2018, investigators received information that ███████████ had posted a photograph and accompanying narrative on Facebook relating to a box containing a "pipe bomb" that he had found along a roadway, on January 24, 2018, (hereinafter Incident #1), prior to the January 30 explosion. ACSO, ATF and FBI investigators subsequently interviewed ████████ who advised that, on January 24, 2018, at approximately 6:30 a.m., he was driving on Martin Road when he observed a small box next to the guardrail on a bridge over a creek. Mr. ███████ stated that the box looked like a jewelry box or treasure chest made of wood with brass or gold bands on the outside. ████████ stopped his vehicle, picked up the box, and shook it slightly to determine if it contained anything. He indicated that the box was moderately heavy and seemed to have something inside. Mr. ███████ opened the lid and observed what he believed to be a possible "pipe bomb" with wires coming from it and going to the lid. ████████ said the device was shiny or galvanized metal, approximately 5-6" in length, 2-2.5" in diameter and wrapped with black, electrical tape. ████████ set the box back down and departed the area before returning with ████████ a co-worker, at approximately 6:50 a.m. who also examined the box. ████████ took a photograph of the box at that time using his cellular telephone.

13. The investigators then went to ████████ residence and interviewed him. ████████ stated that he and ████████ returned to the bridge on Martin Road where ████████ examined the box. ████████ described the box similarly to ████████ but added that he noticed a small loop of monofilament fishing line coming out of the top of the box. ████████ provided more detail including that there were red wires coming out of the "metal cylinder" and that the cylinder was "cone shaped." ████████ said that both men thought the device was a prank so they just left it by the roadside.

14. Subsequent to the January 30 explosion, on February 4, 2018, (hereinafter Incident #3) at approximately 2:50 p.m. ████████ was driving along Highway

6

AYERS007906

29 South in Anderson County when he again observed a small box, this time black in color, along the roadside. ███████ contacted ACSO and reported what he had seen. ACSO, ATF and FBI investigators responded to the scene where bomb technicians x-rayed and examined the box. The box was hard, black plastic with what was later determined to be an electronic window alarm and a small, plastic illuminating ball taped to the outside of the box with black electrical tape, red wires protruding from inside the box and a small piece of clear tape. Inside the box, the investigators found a three page, typed letter that included statements referring to the "Islamic state and flag," "jihad," "the ignorance of the United States," the "package" and that "Tuesday was just a practice run." The letter essentially claimed responsibility for incident(s) and made threats to use "more powerful tools" in the future.

15. On February 15, 2018, (hereinafter Incident #4), at approximately 10:18 p.m., the ACSO received a call from a complainant who said she was driving along Little Mountain Road in Anderson, South Carolina and observed a suspicious package sitting on the double yellow lines in the middle of the two-lane road. The ACSO, South Carolina Law Enforcement Division (SLED), including a SLED bomb technician, the ATF, the United States Secret Service (USSS), and the FBI, including an FBI bomb technician reported to the scene where bomb technicians x-rayed and examined the package. The x-ray and examination revealed that the package was a basket and inside the basket was a child's toy teddy bear stuffed animal. The x-ray revealed that the teddy bear contained what appeared to be a sealed pipe with fragmentation on the inside of the pipe appearing to be nails. There were also batteries and wires present, appearing to be attached to the pipe. Bomb technicians conducted a "render safe" disruption of the possible ignition system by using a precision grid shot on the batteries/possible ignition system. After the render safe disruption, bomb technicians utilized special equipment to remove the pipe and wires. Upon examination, the pipe appeared to be copper. Further render safe operations were conducted and the pipe was transported via secure containment vessel to a safe location where final render safe operations

7

AYERS007907

were conducted.

16. On February 18, 2018, (hereinafter Incident #5), at approximately 7:16 a.m., the ACSO received a call from ▓▓▓▓▓▓▓▓▓▓▓▓ who said he was driving along Highway 29 South in Anderson, South Carolina and observed a suspicious package sitting on the double yellow lines in the middle of the road. The ASCO, the USSS, Greenville County Sheriff's Office (GCSO), and the FBI responded to the scene where bomb technicians x-rayed and examined the package. The x-ray and examination revealed that package was a black wooden box wrapped in black electrical tape with white and grey wires protruding out from the top of the box. The x-ray and examination of the box also revealed that the box did not contain any explosive material and was determined to be safe to handle. Inside the box investigators found a two separate hand-written messages. The first message stated: "We The 19 Lions of ummah Pledge our allegiance To the Islamic State! Insha ALLAH Your county will soon understand That you are No Longer Safe! These littel Boxes WERE ONLY PRACTICE RUNS!! THE TIME IS ALMOST UPON YOU!!!" The second message stated: "Were 30 MILeS AWAY BUT NOT Telling You The DIRECTION". The first message essentially claimed responsibility for the other incident(s). Agents believe that the five above incidents are connected. The five incidents occurred within a roughly two square mile area that would be considered rural and relatively infrequently traveled.

17. On February 24, 2018 (hereinafter Incident #6) at approximately 1:51 a.m., the ASCO received a call reporting a suspicious package in the road at the intersection of Travis Road and Little Mountain Road in Anderson, South Carolina. Bomb technicians from the FBI and ACSO x-rayed and examined the suspicious package. The x-ray and examination revealed that the suspicious package was a likely victim operated improvised explosive device with an ignition switch powered by a battery. It further revealed the suspicious package was a wooden box with dark writing on the outside of the box that appeared to be in Arabic and Farsi. There were also pipes inside the box. Bomb technicians conducted a rendered safe disruption of the possible ignition system by using a

8

AYERS007908

precision grid shot on the batteries/possible ignition system which made the device inoperable. Portions of the device deemed to contain possible energetic material was then transported via containment vessel to a safe location for final render safe operations.

## INVESTIGATION INTO WESLEY DALLAS AYERS

18. On February 26, 2018, a ███████████ was interviewed by law enforcement and stated that a Wesley "Dallas" Ayers was likely responsible for the "bombs" placed on or near the roadways in Anderson and Starr, South Carolina. ███████ lived with Ayer's ████████████ for approximately three months in early 2017 and was there last in March of 2017.

19. Law enforcement has confirmed that Ayers resides at 909 Travis Road, Anderson South Carolina. The property of 909 Travis Road has multiple structures on it to include a mobile home, travel campers and sheds typically used for storage structures. The property is less than 100 yards from the site of Incident #6. Ayers currently occupies one of these structures in the front of the property that is typically used for storage but is also used as a primary residence by Ayers and his ██████████████

20. ██████ stated that he knows that Ayers makes homemade explosives because Ayers once showed him a small amount of explosive, described as powder or grains, that Ayers said he made. Ayers displayed this "explosive" to ████ inside of a shed on the 909 Travis road property. Inside the shed, ████ observed a mixer or tumbler typically used in construction that Ayers said he used to manufacture explosives. Ayers then poured a small amount of "explosive" out of a small mixing bowl, described as a mortar and pestle, onto a table located just inside the door of the shed and lit the "explosive" with a bottle torch. When Ayers lit the "explosive" it smoked and flashed leaving a sulfur like smell in the

---

████████ has admitted to be a methamphetamine user. He also admitted that he has felony convictions for burglary, receipt of stolen property, and other property crimes, consistent with enabling a substance abuse addiction.

9

air. ████ said that Ayers told him never to go into the shed with him because Ayers stated that the shed was "rigged," indicating that it was booby-trapped and would likely explode upon entry if one were to enter without knowledge of how to disarm the device(s).

21. ████ stated that he never saw anyone except Ayers enter or otherwise access the shed. Ayers would also use the explosives he made out of fertilizer to create explosions utilizing extensions cords and cannon fuses. ████ said that he would hear Ayers banging on things in the shed and outside in the yard at all hours and then he would frequently hear explosions, large and small, outside of the mobile home he occupied with ████ at 909 Travis Road.

22. ████ stated that in Ayer's manufacture of explosive devices, Ayers would typically utilize pipes that he would have on hand around the residence. ████ had seen that Ayers would "crimp" the end of a pipe and pour explosive powder in the other "open" end before capping it or crimping it or in some other fashion sealing the "loading" end of the pipe used. Ayers also used HVAC components, pipes and other cylindrical items to fabricate vessels for explosive device creating what is commonly known as an "Improvised Explosive Device."

23. In my law enforcement experience, the crimping of pipes for the fabrication of a explosive device is a somewhat unique methodology.

24. Two of the six devices (Incidents #4 and #6), contained crimped piping consistent with the methodology historically used by Ayers. Additionally, lab analysis of the powder at these two incidents confirmed that the explosive powder had been homemade and is not attributable to any commercial manufacturing.

25. ████ was interviewed by the Federal Bureau of Investigation

---

████ has admitted to Xanax and marijuana usage. Law enforcement also has reason to believe that he is a methamphetamine user. ████ is on probation for a 2nd Degree Burglary conviction. ████ however, is currently in jail for a violation of that probation having recently failed to stop for the

AYERS007910

(FBI), on February 27, 2018. ████████ lived with ████████████ on the property from approximately July 2017 until December 2, 2017 and worked with AYERS at AYERS'S Father's Heating and Air Conditioning repair business which is operated, at least in part, from 909 Travis Road, Anderson South Carolina. ████████ describes Ayers as "different" and as a person who thinks differently from others. According to ████████ Ayers has a penchant for torturing cats by beating them flat with a baseball bat. The bat has barbed wire wrapped around the end and the name "Lucille" written or inscribed on its surface. ████████ indicated that Ayers is also a heavy methamphetamine user who is allegedly obsessed with explosives and guns. ████████ further stated that Ayers typically gets money from his father who owns a heating and air business that is operated at least in part from 909 Travis Road.

26. While living at the 909 Travis Road property ████████ tated that had witnessed Ayers fabricate multiple "waterworks" bombs, also known as overpressure bottle bombs, and large and small "sparkler" bombs and described the manufacture of each type ████████ said that soon after he came to reside at 909 Travis Road he encountered Ayers exiting his Mother's camper with what appeared to be a pipe bomb, described as a large cylinder, possibly galvanized pipe, having a cap on both ends of the cylinder with "clips" that appeared to secure the caps. One end of the cylinder had a fuse approximately twelve to fourteen inches in length protruding from the cap. Ayers lit the fuse of this device in the yard at 909 Travis Road but it failed to detonate.

27. During the past week ████████ was in a position to overhear Ayers make the statement that he "put something out and it got picked up" and now the "Feds" are

---

initiation of blue lights by local law enforcement and a subsequent high-speed chase. The interview of ████████ was conducted at the Anderson County Sheriff's Office, by FBI, at the time of his arrest for failure to stop. ████████ as asked by ACSO if he had any information concerning the recent bombings and he indicated that he wanted to speak to the FBI in hopes that it might help with his probation violation. In addition to Ayers, ████████ also identified a ████████ ho is known locally to make explosive devices and set fires ████████ also a person of interest in this investigation.

11

AYERS007911

in town. These statements were made in the presence of ▆▆▆▆▆ and others. Ayers also said that he made a bomb "the other day" but that it was "nothing that would hurt somebody." Ayers drove away from this location in his black car decorated with red hand prints on the side and red paint splatter on its surface.

28. On at least three occasions, ▆▆▆▆▆ has observed Ayers wearing "Arabic drapes" (Thobe) and a headdress typically worn by devout male followers of the religion of Islam. Ayers walks around in this clothing while holding his hands together and praying, according to ▆▆▆▆▆ has also seen Ayers wear a shirt that depicts a Muslim male in the typical posture of prayer associated with the Islamic faith. ▆▆▆▆▆ inquired where Ayers got the shirt and Ayers told him that he purchased it online from a website that specializes in middle-eastern and Islamic items. Ayers has said that he is Muslim.

29. Agents of the FBI interviewed Ayers on February 26 and 27, 2018, at 909 Travis Road, Anderson, South Carolina. During this interview Ayers denied ever having made any bombs, explosives, or IEDs. While interviewing Ayers, Agents observed that Ayers had a tattoo on Ayer's left forearm depicting a toy teddy bear with bright red glowing eyes. This tattoo was very similar in appearance to the "teddy bear IED" with painted "glowing" eyes utilized with the IED in Incident #4. Ayers also had a tattoo of a "ball and fuse" bomb typically seen in early cartoon depictions of bombs of the burning fuse type.

30. During the course of one of the interviews, FBI agents further observed Ayers wearing a necklace that appeared in part to include a kind of Arabic script. When asked about the necklace, Ayers said that he did not know what the necklace meant, that he thought it "looked cool," and that his mom had given it to him as a gift.

12

31. Agents also noted that Ayers's vehicle was a Buick Riviera, which was a matte black, two-door with a hood scoop and a white "barcode" painted on the front of the hood. A dark baseball bat with barbed wire wrapped around the bat was clearly visible in the rear window of the vehicle. This is believed to be the bat previously described by ███████████.

32. During and after the interview of Ayers, a FBI airborne Surveillance aircraft, in orbit over the property at 909 Travis Road, Anderson South Carolina did observe Ayers and others moving into and out of multiple structures on the property.

33. On January 31, 2018, the day after Incident #2, Detectives Adam Frederick and Scotty Hill of the Anderson County Sheriff's Office were conducting a post blast sweep for evidence at the intersection of Travis Road and Martin Road in Starr South Carolina. While conducting their investigation they noticed a matte black car, which passed slowly at the intersection with the driver taking particular interest in the activity of the detectives. When the car passed for a second time, within a relatively short period, Detective Frederick made a comment to Detective Hill, to the effect that he felt the driver appeared to be up to something nefarious. Detective Frederick made a mental note that the driver had a unique face and that his eye position appeared to him to be widely placed and, therefore, memorable in his mind. Recently, Detective Frederick saw a South Carolina Department of Motor Vehicles (DMV) photograph of Wesley Dallas Ayers and instantly recognized Ayers as the driver of the black car at the site of Incident #2.

34. In my experience, it is not uncommon for the perpetrators of crimes, particularly of this type, to return to the scene of the incident to observe law enforcement activity and the aftermath of the event.

35. During the course of the investigation cellular telephone data was collected after

13

each Incident to date. In the course of the analysis of this data, Ayers Cellular telephone number (864) 437-9874, hereinafter TT#1, was identified as being positioned at the date and time of the probable IED placement timeframe for Incident #4. Further, the data analysis places TT#1 in the Tower and Sector and Range To Tower (RTT) Arc which falls directly over the footprint of the Incident #4 IED placement. The Arc is not an exact positional coordinate but represents the distance to the tower, which creates an arc of probability relative to the tower in that sector. It is further assessed that TT#1 does not frequently utilize the Tower Sector where the Incident #4 IED placement occurred.

36. TT#1 is not subscribed to Ayers. But, Ayers has indicated to law enforcement that he could be reached at the phone number associated with TT#1. And, in fact, a phone call was made by law enforcement to the number on March 1, 2018, and Ayers answered.

37. An open source, publicly accessible observation of Ayers's 2014 Instagram account depicts and displays multiple pictures of Ayers in multiple photographs of a particular macabre and horrific nature. These photographs depict Ayers in grotesque clown face of the horror genre as well as photos of blood soaked hands, knives. There are multiple photographs depicting Ayers himself holding a cleaver and knives and wearing blood soaked garments as if Ayers were participating in violent acts involving the spraying of copious amounts of blood and gore. It is not known if these images were taken during the course of a violent act or, more likely, staged to horrify the observer of the material. The photographs and the reports of animal mutilation may indicate a tendency towards violence and violent acts.

### FACTS RELATED TO HVAC ACTIVITY ON THE PROPERTY

38. During the course of the investigation, it was discovered that Ayers works with his Father at his Father's Heating and Air Conditioning repair business called HG

14

AYERS007914

heating and cooling. It was further discovered that one of the storage sheds, described as a wooden structure, brown in color, located at 909 Travis Road, Anderson, South Carolina is primarily where the tools and equipment for this business are stored.

39. In addition to this structure, aerial surveillance within the last 48 hours has revealed that there are a number of heating and air conditioning units and components clearly visible on the property in corroboration that HVAC materials likely presently exist on the property, as they are not perishable. As described above, Ayers is specifically known to use HVAC parts in building explosive devices. Moreover, the explosive device at Incident #6 utilized a very specific HVAC component in its mechanism. Additionally, there was copper piping used in Incident #4.

40. Additionally, certain of the Incident devices utilized what appeared to be automotive or HVAC grade wiring.

## SEARCH OF 909 TRAVIS ROAD, ANDERSON, SOUTH CAROLINA

41. On March 3, 2018, pursuant to a search warrant signed by the Honorable Kevin F. McDonald, on March 2, 2018, the property at 909 Travis Road was searched by law enforcement.

42. During an initial hazardous-devices sweep of the 909 Travis Road property, in which numerous FBI certified bomb technicians were involved, SABT Chris Doremus of the Louisville Field office located an item of concern near a burn pit outside of the shed suspected to be the workshop. Underneath a piece of plywood and buried partially in the ground he found a box. He used a line to remotely open it. Once inside, numerous items of interest, specifically identifiable to and consistent with devices left at various of the above-described Incidents, were observed, including Sunbeam double a batteries; a package of glow sticks; copper pipe fittings; HVAC capacitors; zip ties; one half of a door and window alarm

15

(similar to what would come with the alarm attached to the device at Incident #3); a shotgun shell that had been peeled or cut open; and an item that resembled a butane soldering iron. A few feet away, was also observed, on the ground, three plastic clips used to hang Christmas lights, which are seemingly identical to the one in the device at Incident #6, located at the intersection of Travis Road and Little Mountain Road. Indeed, numerous strings of Christmas lights have been observed at several locations on the property. Inside one of the secondary structures, a camper, Sunbeam double a batteries as well as items which had labels consistent with a label on the device at Incident #1 was found. The label was yellow in color and bearing similar markings to those previously observed by law enforcement at a Goodwill.

43. During the course of the protective sweep of 909 Travis Road, SA Thomas Kurtz with ATF and three Anderson County Deputies continued the sweep to the edge of the adjoining property at 913 Travis Road, immediately contiguous with the rear property line of 909 Travis Road, in order to render safe the entirety of 909 Travis Road and any portion of the adjacent property at 913 Travis Road that might pose some danger to law enforcement. SA Kurtz was able to observe what appeared to be damaged, non-organic objects and debris on 913 Travis Road. The property is a large open field with a narrow tree line running down the east side of the property. Law enforcement performed a brief sweep for explosive material, devices, and subjects. The agents observed a small recently burnt pile with metal foil, PVC, and shotgun shells that appeared fresh. As the sweep continued, several divots which are consistent with post blast areas were identified. The divots in the ground are covered with tree limbs. There are no trees in the immediate area and the piles appeared to be purposely placed possibly to camouflage the areas. During the sweep several areas of debris were observed to include broken PVC piping, an electronics board, green plastic and a backpack. The backpack appeared to be torn apart severely and consistent with a blast. The green plastic appeared consistent with small pieces located in one of the devices.

16

AYERS007916

44. Aerial surveillance from the last week has shown Wesley Dallas Ayeres making trips to the wood line at the back of the 909 Travis Road property and in the direction of some of the items found at 913 Travis Road. Such surveillance also indicates that at least one car may be located on the property.

45. In my law enforcement experience, this largely vacant lot is an ideal blasting and practice zone for explosives because it is away from primary living and working structures at 909 Travis Road. The observed objects on the property thus far are consistent with such view.

46. As indicated, both properties are owned by Amy Ayers.

47. Based on the above, your affiant respectfully submits that probable cause exists to believe that evidence of a crime, particularly explosives, destructive devices, components and tools used to manufacture destructive devices, documents, digital devices and records showing proof of possession of and manufacture of destructive devices as well as indicia of residency or ownership are currently located at the property described in Attachment A. Specifically, in this investigation, there is reason to suspect that Wesley Dallas Ayers, has violated Title 26, Section 5861(d), of the United States Code by possessing firearms, that is, destructive devices, which are not registered to him in the National Firearms Registration and Transfer Record. A review of the ATF National Firearms Registration and Transfer Record indicates that Ayers has no firearms or explosives registered to him.

48. As such, your affiant respectfully requests permission to search the described location and any vehicles for items that constitute evidence of the commission of a criminal offense, fruits of the crime, items otherwise criminally possessed, and property which is or has been used as the means of committing a criminal offense (see Attachments A, B and C for exact description).

[SIGNATURES ON FOLLOWING PAGE]

17

ROBERT TARTAGLIA
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SWORN to and SUBSCRIBED before me this ___3___ day of March, 2018

KEVIN F. MCDONALD
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF SOUTH CAROLINA

18

AYERS007918

## Attachment "A"

### Description of Properties to be Searched

1. The property or premises is located at 913 Travis Road, Anderson, South Carolina, 29626, in the vicinity of Latitude 34.4391 Longitude -82.6917, Judicial District of South Carolina.

2. The property is immediately adjacent to the rear property line of Ayers's primary residence at 909 Travis Road, Anderson, South Carolina. The property is a large open field with a narrow tree line running down the east side of the property. One vehicle or more may be located on the property. Also to be searched are all sheds, outbuildings, appurtenances, the curtilage and vehicles located on the property, as well as the electronic contents of wireless telephones, computers, or other digital storage or media located at the premises, or within any sheds, outbuildings, appurtenances, and vehicles located on the property, which may be currently obscured but eventually found.

19

AYERS007919

Photograph of 913 Travis Road, outlined in green:



AYERS007920

Photograph of 909 Travis Road, outlined in green:



AYERS007921

## Attachment "B"

### Description of Items to be Searched for and Seized

1. Assembled improvised explosive devices (IED), and unassembled components of these devices to include, but not limited to:

Containers used to confine explosives or conceal improvised explosive devices:

Metal, plastic or cardboard containers (i.e. pipe nipples, end caps, pvc pipe, cardboard tubes, copper tubing, CO2 containers, grenade bodies, or other improvised containers;

Explosive filler material to include, but not limited to:

Powders (i.e., black powder, smokeless powder, Pyrodex, flash powder, improvised powders, powder removed from ammunition), match heads, or

Commercially manufactured high explosives materials (i.e., cast boosters, C-4 or other plastic explosives, dynamites, slurries, emulsions, detonation cord, Tannerite), or military explosives to include TNT, deta sheet, C-4, or other military explosives to include explosives removed from live military ordnance;

Unmixed chemical powders, substances or liquid chemicals that can be combined to produce an explosive material, (i.e., citric acid, hexamine, hydrogen peroxide, nitric acid, mercury, potassium perchlorate, acetone, silver nitrate, potassium chlorate, muriatic acid, aluminum, ammonium nitrate, etc.)

Household powders, chemicals and items such as cane sugar, powdered sugar, charcoal, wood shavings and others items which could be used as a fuel in an explosive compound.

Mixing bowls, glassware or other containers, spoons, funnels, strainers or other mixing implements.

Commercially manufactured detonators, military detonators, fireworks or improvised detonators, either electric or non-electric or other initiating components to include but not limited to:

Filaments, light bulbs, rocket motors, fuses (i.e. commercially manufactured hobby fuse, Safety fuse, quick match, electric matches, squibs, military training fuses, or other improvised fuses;

Components used in the manufacture of improvised explosive devices, to include, but not limited to:

22

AYERS007922

Wires/wiring, tape (i.e., electrical, duct, masking), automotive wiring and parts, HVAC wiring and parts, adhesives, wire connectors, shrink tube, wire ties, relays, switches, improvised switches,  circuit boards, capacitors, batteries, E-cells or other power sources, and timing/remote control mechanisms;

Trash or debris from improvised explosive devices and/or components to include, but not limited to:

Packaging material for components (i.e., toggle switch packaging, electronic or mechanical timer packaging or instructions), parts/pieces of components, cut sections of electric detonator wires, delay tags, packaging for rocket motors, remnants of radio controlled cars, etc, and remnants of previously detonated improvised explosive devices.

Any items likely to be contaminated or show traces of any chemicals or explosive materials, including but not limited to clothing, hats, shoes, rugs, cushions, vacuum cleaner bags and attachments.


2.      Literature pertaining to the assembly, manufacture and functioning of explosive devices or materials, including, but not limited to: Books, pamphlets, drawings, sketches, diagrams, Photographs, photocopies, computer generated, or computer stored information of same.

3.      Documents and photographs, including personal mail, checkbooks, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, receipts for vehicle parts and repairs, telephone answering machine introductions and photographs of themselves occupying their residence and/or vehicles(s) and other tangible evidence of their ownership and possession of the property listed in Attachment "A".  Also, any Arabic, Islamic or other religious literature, documents, or artifacts.


4.      Any digital device used to facilitate the possession of explosives, improvised explosive devices, and the manufacture of improvised explosive devices and forensic copies thereof.

      a.      With respect to any digital device containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of the same, sufficient to show the actual user(s) of the digital device.

      b.      As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

23

AYERS007923

c.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

24

AYERS007924